COMMISSIONERS OF PUBLIC WORKS *vs.* CITIES SERVICE OIL COMPANY.

Suffolk.    October 11, 1940. — February 25, 1941.

Present: FIELD, C.J., DONAHUE, DOLAN, & COX, JJ.

License. Department of Public Works. Tidewaters. Harbors. Words, "Terms."

The department of public works, in granting a license under R. L. c. 96, §§ 17, 19, for the erection of structures upon tidewater property owned by the Commonwealth, no compensation therefor being required or paid under § 24, might validly make the license subject to the condition in substance that the structures "are for temporary

use only and shall be removed . . . upon notice" by the department, notwithstanding that the structures erected and used by the licensee were valuable and erected in good faith within § 21.

BILL IN EQUITY, filed in the Superior Court on September 29, 1938.

The defendant appealed from a final decree entered by order of *Brogna*, J.

*F. H. Stewart,* (*A. F. Ray & F. X. Daly* with him,) for the defendant. .

*E. O. Proctor,* Assistant Attorney General, for the plaintiffs.

Cox, J.    This is a bill in equity in which the plaintiffs ask that the defendant be ordered to remove certain structures erected by it or its predecessors upon land of the Commonwealth and to quit and make no further use of the premises.    In effect, what is sought is the revocation of a license issued by the department of public works, division of waterways and public lands (see St. 1919, c. 350, §§ 111, 113; G. L. [Ter. Ed.] c. 91), to a predecessor of the defendant, under which the structures were erected.    The case was tried upon a statement of agreed facts, and documentary evidence relating thereto.    The plaintiffs are the commissioner and associate commissioners of public works of the Commonwealth in control and supervision of the department of public works.    (G. L. [Ter. Ed.] c. 16, § 2.)    The defendant is the owner of a parcel of land that adjoins the premises in question, title to which was acquired from the Commonwealth by mesne conveyances.

In 1917, a predecessor of the department of public works, by virtue of statutory authority (St. 1911, c. 748, as amended), took, by eminent domain, certain lands and flats in Boston Harbor, including the parcel now owned by the defendant which was conveyed in 1919 to one of its predecessors in title.    The taking by eminent domain was "for the purpose of constructing, or securing the constructing or utilizing of, piers, and, in connection therewith, highways, waterways, railroad connections, storage yards and sites for warehouses and industrial establishments."

On June 7, 1920, the defendant's predecessor, to whom the

parcel hereinbefore referred to had been conveyed, petitioned the department of public works, setting forth that it desired "to build dolphins and mooring piles for a temporary berth in and over the tide-waters of Haywards Creek on Weymouth Fore River in the Town of Braintree," and asking that a license be granted to build and maintain the structure in accordance with the plans filed with the petition, "subject to the provisions of Revised Laws, c. 96, and St. 1911, c. 748, and of all laws which were or might be in force applicable thereto." On June 21, 1920, the petitioner was given license No. 51, by the terms of which it was authorized and licensed, "subject to the provisions of . . . [R. L. c. 96], chapter 748 of the Acts of 1911, and of all laws which are or may be in force applicable thereto, to build a temporary pile pier and dolphins in Haywards Creek . . . for the purpose of providing a berth for vessels, in conformity with the accompanying plan . . . ." The area allotted for the temporary pier is defined in the license and shown upon the plan. It is further provided that the "license is granted with the consent of the Commonwealth of Massachusetts as owner of the flats on which the larger part of said pile pier and said dolphins are to be constructed, and subject to the laws of the United States. It is a condition of this license that the said pile pier and dolphins and mooring pile are for temporary use only and shall be removed to the satisfaction of this Department upon notice in writing." The licensee erected the pier and dolphins "in good faith in accordance with License #51 and the plan attached to it . . . and large sums of money were expended thereon and in connection therewith. They were constructed by the licensee with the upland approach on its own land. The pier was built partly upon the land of the Commonwealth and partly upon land of the . . . [licensee] . . . As contemplated by License #51, the 'larger part' was built upon the land of the Commonwealth." The pier has been allowed to remain as built since 1921 and is in substantially the same condition as when first erected at a cost of approximately $10,000, and "the pier and structures were when built and still remain useful and valuable structures."

The Commonwealth has never received any revenue by way of rent or compensation from the defendant or its predecessors in title for the use of the wharf or pier under said license. The defendant and its predecessors in title leased no land from the Commonwealth, and, under the provisions of R. L. c. 96, § 24 (see G. L. [Ter. Ed.] c. 91, § 22), the Governor and Council did not require that the original licensee should pay any compensation for the rights given, and none, in fact, was paid.

On December 31, 1936, in consequence of a vote of the department of public works, the defendant was notified to remove the structures from tide water, but it did not do so. On July 13, 1938, in consequence of another vote, the defendant was notified to remove from the flats of the Commonwealth at Haywards Creek the structures built under said license No. 51, "in accordance with the terms and conditions thereof." The defendant did not comply with this notice, and the structure is now held and maintained by it. The defendant and its predecessors in title have used the structure continuously "as a means of access and egress to and from the navigable waters of Haywards Creek and Weymouth Fore River."

"If the . . . [defendant] has riparian rights at the locus of the wharf and if such rights embrace the privileges hereinafter stated in this paragraph or any of them, and is denied access to the navigable waters in Haywards Creek from its land, such riparian rights will be substantially injured by having its main artery of approach to and contact with vessels cut off on the northerly water front; by losing the right of swift and convenient unloading of tankers by pipe lines from the northerly water front, and by losing the right to have cargoes delivered at Haywards Creek immediately adjacent to its receiving tanks. The pier built and maintained under License #51 is not an obstruction to navigation."

The findings of the trial judge, the opinion of this court, the rescript and final decree in the case of *Scullin* v. *Cities Service Oil Co.* 304 Mass. 75, are referred to, and may "be given such force and effect as they by law are entitled to have."

In the case at bar the trial judge found the facts as stated, and ruled that the license was revocable and that it had been revoked. The defendant appealed from a final decree assented to as to form, adjudging that the license is revocable and has been revoked, and in effect, ordering that the defendant quit so much of the premises of the Commonwealth as are occupied by the structures in question and remove them within a stated time if it desires to do so.

Prior to St. 1869, c. 432, legislative enactments conferring authority to erect and maintain structures in Boston Harbor as far as the harbor line established in 1840 were held to operate as grants and not merely as revocable licenses. See St. 1841, c. 35, *Fitchburg Railroad* v. *Boston & Maine Railroad,* 3 Cush. 58, 87; St. 1851, c. 26, *Bradford* v. *McQuesten,* 182 Mass. 80, 81, 82; St. 1855, c. 481, *Treasurer & Receiver General* v. *Revere Sugar Refinery,* 247 Mass. 483, 489. In the *Bradford* case it was said, at page 82: "Hundreds of similar acts [such as St. 1851, c. 26] had been passed before the St. of 1869, c. 432, was enacted declaring that any authority thereafter given to build on or enclose ground in tide waters should be construed as a revocable license, and it has been the common understanding, we think, that they operated as grants, and wharves have been built and improvements made on that footing. . . . In the present case there is nothing in the circumstances disclosed tending to show that the act was not intended to operate, and should not be construed as operating as a grant. The interests of the Commonwealth in navigation are carefully protected by limiting the extension to the harbor line, and by requiring that below low water the wharf shall be built on piles which shall be certain distances apart. It would seem plain that the Commonwealth intended to part with all its rights except so far as contained in the conditions on which the grant was made."

St. 1869, c. 432, provided that all authority or license that had been granted during that session of the Legislature, or that might be thereafter granted by the Commonwealth to any person or corporation to build any structure upon ground over which the tide ebbs and flows, or to fill up or inclose the

same, whether such ground be above or below low water mark, or within or outside of one hundred rods from high water mark, or whether it be private property or the property of the Commonwealth, should be subject to the following conditions, whether they were expressed in the act or resolve granting the same or not, namely: such license or authority should be revocable at any time, "at the discretion of the legislature, and shall expire at the end of five years from its date, except where and so far as valuable structures, fillings or inclosures, as provided in the act or resolve, shall have been actually and in good faith built or made under the same." All things done under such license or authority were made subject to the determination and approval of the harbor commissioners as provided in § 4 of St. 1866, c. 149. Said § 4 provided, among other things, that all persons authorized by the Legislature to build structures over tide waters, or to fill any flats, should, before beginning the work, give written notice to the harbor commissioners, who constituted the board established by said c. 149, § 1, of the work they intended to do, and submit plans of any proposed structures and of the flats to be filled, and of the mode in which the work was to be performed; and no such work was to be commenced until the plans and mode of performing the same had been approved in writing by a majority of the commissioners. They were empowered to alter these plans at their discretion, and to prescribe the direction, limits and mode of building the structures "to any extent that does not diminish or control the legislative grant," and all such works were to be executed under their supervision. See R. L. c. 96, §§ 21, 24. Until 1869 the Legislature appears to have been content with the construction that the court had placed upon the grant of authority to erect structures in tide waters, but by said St. 1869, c. 432, the legislative intent was declared that thereafter any such authority should be construed as a revocable license, and not a grant. See *Bradford* v. *McQuesten*, 182 Mass. 80, 82. The provision in said c. 432 that any authority or license should be subject to the conditions therein provided, "whether they be expressed in the act or resolve granting the same or not,"

cannot be construed as a curtailment of the power of succeeding Legislatures to grant licenses subject to other conditions as to expiration or revocation. C. 1, § 1, art. 4, of the Constitution of the Commonwealth. *Opinion of the Justices,* 302 Mass. 605, 610–611.

St. 1872, c. 236, accomplished a marked departure from the methods by which authority had been granted in relation to the erection of structures in tide waters. It provided in § 1 that any person might build or extend a wharf, or construct a pier or other structure, fill land or flats, or drive piles in and over tidewater below high water mark, within the line of riparian ownership, on any shore, and within whatever harbor lines there might be at the time established by law along such shore, "provided, the license of the board of harbor commissioners is first obtained in a manner provided by . . . [St. 1866, c. 149, § 4]." Section 2 provided that the board might license such construction or work below high water mark and beyond the line of riparian ownership "upon such terms as they prescribe: provided, however, that no such license beyond the line of riparian ownership shall be valid unless approved by the governor and council; and provided, further, that no such license on any shore shall have any effect beyond such line of riparian ownership, except where a harbor line has been established by law along such shore; and no such license shall have effect beyond such harbor line, except in relation to a structure authorized by law outside such line." Section 3 provided, among other things, that every license granted should set forth the "terms of the same, and specify by metes, bounds and otherwise, so as to identify and define, the location, dimensions, limits and mode of performing whatever is authorized by said license." By § 4, licenses granted under the authority conferred were made subject to the provisions of St. 1866, c. 149, and St. 1869, c. 432, "so far as applicable and not inconsistent with this act." See R. L. c. 96, §§ 17, 19.

St. 1874, c. 284, entitled "An Act to secure to the Commonwealth the value of its property in lands flowed by tide-water," provided that whenever any authority or

license was thereafter granted by the Legislature or by the board of harbor commissioners with the approval of the Governor and Council, to build any wharf or other structure or to fill or otherwise occupy land in tidewater lying below the line of low water mark not exceeding one hundred rods from high water mark, the person or corporation so authorized should pay to the Commonwealth, before the work authorized or licensed was begun, "such compensation for the rights and privileges granted in such land as shall be determined by the governor and council to be just and equitable besides making compensation for tide-water displaced when required" under St. 1866, c. 149. It also provided that when such compensation had been paid for any such rights and privileges, "the same shall not, under the provisions of . . . [St. 1869, c. 432] terminate in five years and shall not be revocable unless provision is made in such revocation for the repayment by the Commonwealth to the holder of such rights and privileges, of the amount of such compensation." See R. L. c. 96, § 24.

St. 1874, c. 347, among other things, empowered the board of harbor commissioners to license any person to build structures or to fill land or flats below high water mark and beyond the line of riparian ownership in and over tidewater along the shore of which no "commissioners'" or harbor line had been established by law, "provided, however, that no such license shall have any validity beyond the line of riparian ownership unless approved by the governor and council." Every license so granted was made subject to the provisions of St. 1872, c. 236, §§ 3 and 4. See R. L. c. 96, §§ 17, 19. By various statutory enactments, culminating in St. 1919, c. 350, § 111, the rights, powers, duties and obligations of the board of harbor commissioners, and of the succeeding boards, became vested in the department of public works. (See now G. L. [Ter. Ed.] c. 91.)

The license in question was granted on June 21, 1920, by virtue of the provisions contained in R. L. c. 96. (See St. 1911, c. 748.) Section 8 provided, among other things, that the board of harbor and land commissioners should have general care and supervision of the harbors and tidewaters

within the Commonwealth, of the flats and lands flowed
thereby, and of all structures therein, in order, among other
things, "to protect and develop the rights and property of
the commonwealth in such flats and lands."   By § 17 the
board was authorized to license and "prescribe the terms for
the construction or extension of . . . [structures], or for
the filling of land or flats, or the driving of piles in tide water
below high water mark, but not, except as to a structure
authorized by law, beyond any established harbor line, nor,
unless with the approval of the governor and council, be-
yond the line of riparian ownership."   Section 19 provided,
among other things, that every license under the provisions
of said c. 96 "shall state the terms upon which it is granted
and shall specify by metes, bounds and otherwise the loca-
tion, dimensions and limits and the mode of performing the .
work authorized thereby."   Section 21 provided that every
authority or license granted since 1868, "or hereafter granted
by the commonwealth . . . to build a structure . . . upon
ground over which the tide ebbs and flows, . . . whether
such ground is above or below low water mark, or within or
beyond one hundred rods from high water mark, or whether
it is private property or the property of the commonwealth,
shall be subject to the following conditions, whether they are
expressed in the act, resolve or license granting the same or
not:  such authority or license shall be revocable at the dis-
cretion of the general court, and shall expire in five years
from its date, except as to valuable structures . . . actually
and in good faith built or made under the authority or license
during the term thereof;  but if compensation has been paid
to the commonwealth under the provisions of section twenty-
four or under any similar provision of law, the rights and
privileges for which it has been paid shall not so terminate
or be revoked unless provision is made for repayment of such
compensation."   Section 22 provided, among other things,
that no license or other authority to build structures or to
fill up or enclose any such ground "shall be construed to
interfere with or impair the right of any person affected
thereby to equal proportional privileges of approaching low
water mark or one hundred rods from high water mark, or

harbor lines established by law, or to impair the right to obtain a license or authority so to approach of persons having interests in lands or flats which may be affected thereby, or to impair the legal rights of any person. All things done under such license or authority shall be subject to the approval of said board." Section 24 provided that if authority or a license was granted to build structures upon land in tide water, such compensation as shall be determined by the Governor and Council shall be paid to the Commonwealth for the rights granted "in any land the title to which is in the commonwealth."

The defendant contends that the phrase "prescribe the terms" in R. L. c. 96, § 17 (see, now, G. L. [Ter. Ed.] c. 91, §§ 14–18), related only to the terms for the construction of structures, and that it had nothing to do with the duration of the license or the tenure of the structures after they had been erected. It is to be noted that § 19 of said chapter required that every license not only should state the "terms upon which it is granted," but also should specify the "location, dimensions and limits and the mode of performing the work authorized thereby." When by St. 1872, c. 236, the Legislature departed from its policy as the sole licensing authority, it had already, by St. 1866, c. 149, delegated to the harbor commissioners full power to alter plans and to prescribe the direction, limits and mode of building the structures authorized by legislative authority to any extent that did not diminish or control the legislative grant. This authority of the board was reaffirmed by St. 1869, c. 432. But St. 1872, c. 236, as already pointed out, went further and gave the board authority to grant the license itself. By the provision of § 1 of said c. 236, that the license of the board should be obtained in the manner provided by St. 1866, c. 149, § 4, the Legislature must have intended that the procedure there provided should be followed, as, in fact, it was required that it be followed where the authority was granted by the Legislature itself. By § 2 of said c. 236, the board might license the construction or work "upon such terms as they prescribe," subject to two provisos, hereinbefore stated, relating to licenses beyond the line of riparian

ownership and the harbor line.  By § 3 of said c. 236, every license was required to set forth "the terms of the same," and something more, that is, the location, dimensions, limits and mode of performing the work.  But the board, since 1866, had been required to approve plans for the work, which it could alter at its discretion, and also had been empowered to prescribe the direction, limits and mode of building the structures.  The new provisions, that it could grant licenses for the work "upon such terms as they prescribe" and that the licenses should set forth the "terms of the same," are not without significance.  It is true that by § 4 of said c. 236, licenses were made subject to the provisions of St. 1866, c. 149, and St. 1869, c. 432, "so far as applicable and not inconsistent with this act."  But we are of opinion that the construction of the words "upon such terms as they prescribe," as it is to be pointed out, is not that for which the defendant must be held to contend.

In the revision of the statutes appearing in Pub. Sts. (1882), it was provided by c. 19, § 9, that the board might grant licenses "upon such terms as they shall prescribe," and § 10 of said chapter contained provisions as to what the license should set forth, identical with those contained in St. 1872, c. 236, § 3, except in a minor change of phraseology which is of no consequence.  When the next revision of the statutes came, R. L. (1902), a change was made in the phraseology of Pub. Sts. c. 19, § 9.  As already pointed out, § 17 of R. L. c. 96 was made to read that the board might license and "prescribe the terms for the construction" of structures in tide water.  The commissioners who were appointed to consolidate and arrange the public statutes were not authorized to make substantive changes.  Resolves of 1896, c. 87.  *Paine* v. *Newton Street Railway*, 192 Mass. 90, 93.  There is nothing in the report of the commissioners or in the act of the Legislature in adopting the report to indicate any purpose, intention or suggestion that the substance of the law, as contained in Pub. Sts. c. 19, § 9, was to be changed, and it is a familiar rule that in such circumstances verbal changes in the revision of a statute do not alter its meaning and are construed as a continuation of preëxisting

laws. *Derinza's Case,* 229 Mass. 435, 442. *Mackintosh, petitioner,* 246 Mass. 482, 484–485. *Medford Trust Co.* v. *McKnight,* 292 Mass. 1, 28. We are of opinion, therefore, that R. L. c. 96, §§ 17 and 19 contain no substantive change in the provisions in question that were first enacted by St. 1872, c. 236, §§ 1, 2 and 3. In our opinion the legislative intent appears under R. L. c. 96, §§ 17 and 19, that there are three matters that are the subject matter of the license: (1) the "terms" of the license itself; (2) the location within or upon which it is to be exercised; and (3) the mode of performing the work authorized.

It is a familiar canon of statutory interpretation that every word of a legislative enactment is to be given force and effect so far as reasonably practicable. No part is to be treated as immaterial or superfluous unless no other rational course is open. *Libby* v. *New York, New Haven & Hartford Railroad,* 273 Mass. 522, 526. *Opinion of the Justices,* 275 Mass. 575, 578. "The words of a statute are the main source for the ascertainment of a legislative purpose. They are to be construed according to their natural import in common and approved usage. . . . Statutes are to be interpreted, not alone according to their simple, literal or strict verbal meaning, but in connection with their development, their progression through the legislative body, the history of the times, prior legislation, contemporary customs and conditions and the system of positive law of which they are part, and in the light of the Constitution and of the common law, to the end that they be held to cover the subjects presumably within the vision of the Legislature and, on the one hand, be not unduly constricted so as to exclude matters fairly within their scope, and, on the other hand, be not stretched by enlargement of signification to comprehend matters not within the principle and purview on which they were founded when originally framed and their words chosen. General expressions may be restrained by relevant circumstances showing a legislative intent that they be narrowed and used in a particular sense." *Commonwealth* v. *Welosky,* 276 Mass. 398, 401–402. It has been said that the word "terms" generally relates to conditions. *Hurd* v. *Whitsett,* 4 Colo. 77, 89–90.

*People* v. *J. O. Beekman & Co. Inc.* 347 Ill. 92, 96.   In *West Virginia & Pennsylvania Railroad* v. *Harrison County Court,* 47 W. Va. 273, 279, in construing a statutory provision that, when the people had voted a subscription to aid the construction of a railroad, it should be made on such terms as the county court deemed advisable, it was held that it was proper for the court, within the meaning of the word "terms," to impose a reasonable limitation in time for the completion of the work.

We are of opinion that the word "terms," as used in R. L. c. 96, §§ 17 and 19, comprehends the imposition of conditions other than those relating to the precise manner of construction, if they are not unreasonable and do not contravene the statute as a whole.   *Crease* v. *Babcock,* 23 Pick. 334, 342. It is of some consequence that § 16 of said c. 96, relating to persons who are authorized "by the general court" to build over tide waters, provided that no such work should be commenced until written notice had been given to the board and plans submitted, "of any proposed structure . . . and of the mode in which the work is to be performed, and the same has been approved in writing by said board, which may alter such plans and prescribe any direction, limits and mode of doing the work consistent with the legislative grant." Under § 16, the authority was to be granted by the Legislature, and we have no doubt that it could limit the duration of the authority and establish the location.   But as to the nature of the structures to be erected, and the mode of doing the work, it was for the board to determine "consistent with the legislative grant."   Under §§ 17 and 19 of said c. 96, when the board granted a license it was to be on such terms as it should prescribe, the location was to be defined, and also the mode of performing the work was to be specified. We are of opinion that, in the case at bar, under the authority to prescribe the terms of a license, the board could limit it as to time.

The court has not been called upon heretofore to construe the provisions of the statute under consideration for the purpose of determining the extent of the power of the governmental agency to revoke a license that it had issued.   In

1927, however, the Attorney General gave an opinion to the commissioner of public works relative to the matter. In discussing the provisions of St. 1869, c. 432, as amended, it was said, among other things, that, in effect, all licenses granted after 1868, "irrespective of other terms and conditions, were made subject in any event to forfeiture for nonuser of the rights granted, with the exception in case compensation had been paid. . . . Manifestly it could not and was not intended to curtail the power of future legislatures to grant licenses subject to other conditions as to expiration or revocation." 8 Op. Atty. Gen. 216, 220–221. The question was considered whether the department of public works could prescribe as a term of a license that it should be revocable and that structures built thereunder should be removed upon revocation, if under the circumstances of the particular case, such requirement was reasonable. It was stated that information was at hand that, since 1872, it had been the practice of the harbor commissioners and their successors to grant licenses for the erection of temporary structures upon condition that they should be removed at the request of the board, that licenses so granted might be revoked or modified, and that many such licenses had been issued. Reference was made to the report of a former Attorney General in an opinion rendered January 15, 1906, to the effect that the board had the right, in granting the license, to reserve expressly the right to revoke it for some reasonable cause, and that the provisions of R. L. c. 96, § 21, were not in conflict (pages 221–222). In the opinion rendered in 1906 it was said that in the license under consideration there was an express reservation of the right to revoke; that "The word 'terms' as here used means conditions rather than time, as when used in the phrases, 'terms for life,' 'terms for years' etc. Conditions as to the time which the license shall run, are, however, not necessarily excluded from the class of terms which may be prescribed by the board. . . . That which the grantee gets is much less than an absolute license. . . . He knows that he may be required to cease to act under the license at any time, and by accepting it with such a condition he may fairly

be said to agree to the condition." The Attorney General, in 1927, was of the opinion that the licensing board had the power to prescribe as a term of a license that it should be revocable and that structures built thereunder should be removed upon such revocation, if, under the circumstance of the particular case, such requirement is a reasonable one. It was pointed out, however, that it would not be within the power of the board to prescribe as a term of a license for which compensation had been paid, that it should terminate or be revocable without making adequate provision for the repayment of such compensation, but that where a revocable license was given, no right in land of the Commonwealth was granted, and accordingly, no compensation was required to be paid. In conclusion it was said: "Statutory provisions for the regulation of structures and works in tidewater have remained substantially unaltered for fifty years. In several important respects the power of the Division [department of public works] to grant licenses, to prescribe their terms and to supervise works in tidewater needs definition and, it may be, enlargement." (Page 226.)

But the defendant contends, inasmuch as the original licensee erected structures "in good faith," in accordance with the license, which are still "useful and valuable structures," that by virtue of the statute in question the license operated as a legislative grant. Reliance is placed upon § 21 of said c. 96 wherein it is provided, among other things, that every authority or license granted after 1868 shall be subject to the conditions, whether expressed or not, that "such authority or license shall be revocable at the discretion of the general court, and shall expire in five years from its date, except as to valuable structures . . . actually and in good faith built or made under the authority or license during the term thereof." It is contended that, by this provision, the power of revocation first provided for by St. 1869, c. 432, could not be exercised if valuable structures had been built in good faith during the term of the authority or license. We are of opinion, however, that the provisions of said § 21, just quoted, are to the effect that the exception as to valuable structures does not apply

in the event that the General Court, in the exercise of its discretion, sees fit to revoke the authority or license, but, on the contrary, that it is an exception relating to the provision that the authority or license shall expire in five years from its date. Any other construction of the statute would, as a practical matter, render the right of revocation of little, if any, value except in cases where a licensee had failed to erect valuable structures within five years. That it was within the contemplation of the General Court that it might continue to authorize the erection of structures in tidewater is apparent from the provisions of St. 1866, c. 149, § 4 (R. L. c. 96, § 16). It hardly seems that it was the intention, in providing that an authority or license should be revocable at its discretion, to limit this power of revocation to cases where valuable structures had not been erected. In that event, the license would expire by its very limitation. It is to be observed that by said § 21, it is provided that if compensation has been paid to the Commonwealth for the rights granted in any land, the title to which is in the Commonwealth, such compensation having been determined by the Governor and Council, the rights and privileges for which it has been paid "shall not so terminate or be revoked" unless provision is made for repayment of such compensation. In at least one instance, prior to 1869, the Legislature, in authorizing the erection of a wharf, provided expressly that "this grant" should not extend beyond a date which made the term of the authority approximately five years. See St. 1856, c. 193. We are not called upon to determine what the rights of the defendant would be if the license in question had been revoked by the General Court.

It is assumed that the defendant acquired rights under the license that was granted. In the application for the license, the petitioner stated that it desired to build certain structures "for a temporary berth in and over the tide-waters . . . that the land above low-water mark which would be covered or occupied by said structure . . . is owned by . . . [the petitioner] and The Commonwealth," and it asked that a license be granted to build and maintain the structure in accordance with the plans submitted, subject

to the provisions of R. L. c. 96, St. 1911, c. 748 (the statute providing for the creation of the board to be known as the directors of the port of Boston), and "of all laws which are or may be in force applicable thereto." The license recited that the applicant had applied for it "to build a temporary pile pier and dolphins," and it was given upon condition "that the said pile pier and dolphins and mooring pile are for temporary use only and shall be removed to the satisfaction of this Department upon notice in writing." The larger part of the structure was upon flats owned by the Commonwealth. We are of opinion that the petitioner obtained that for which it asked. There is nothing in the statement of agreed facts, even by way of implication, to show that it objected to any of the provisions of the license, and we must assume that it accepted them and that whatever was done under the license was with a full understanding of, and acquiescence in, its provisions. In fact, it appears in the statement that the licensee erected the pier and dolphins "in good faith in accordance with License #51 and the plan attached to it." The Commonwealth received nothing by way of rent or compensation for the use of the wharf or pier, and the Governor and Council did not require that the licensee should pay any rent or compensation "for the rights given, and none was in fact paid," notwithstanding the provisions of § 24 of said c. 96, hereinbefore referred to. In our opinion the fact that the licensee erected the structure "in good faith in accordance with [the] License" is to be considered with the further fact that the license was for the erection of a temporary structure, upon condition that it was for temporary use only and should be removed to the satisfaction of the department upon notice in writing, which notice, admittedly, it received.

The authority of the licensing board is commensurate with the provisions of the statute clothing it with its power. *Lowell* v. *Archambault*, 189 Mass. 70, 73. The broad power conferred by the Legislature to grant licenses upon such terms as the board shall prescribe, in the absence of statutory limitations, must be construed as authorizing it to impose terms that are not unreasonable. There was an express

statutory provision that if compensation had been paid to the Commonwealth, as none was, the rights and privileges for which it had been paid, should not terminate or be revoked unless provision was made for repayment of such compensation. R. L. c. 96, § 21. The defendant contends that it has valuable rights, by virtue of the license, in the very land of the Commonwealth, although it does not appear that any attempt was made to comply with § 24 of said c. 96 under which the compensation referred to in § 21 was to be determined. It may be that the opinion of the Attorney General, already referred to, was followed, to the effect that when a revocable license was granted, no right in the land was granted, and accordingly, no compensation was required to be paid.

We are of opinion, in the circumstances, that the licensee must be held to have accepted the license for the erection of structures "for temporary use only," and, if in accordance with the terms of the license any such were erected, that, upon notice to remove them, it would be afforded, as it was, an opportunity to do so. In effect, the notice amounted to a revocation of the license. The decree that was entered, in so far as it relates to removal, requires this only "if the respondent so desires." This provision in the decree affords the defendant the opportunity of removing its property. The erection of the structures for temporary use and upon condition that their removal could be required cannot be said to have given the defendant, in the circumstances, rights that would ripen into a permanency, so that the consequences of an order for removal of the structures amount to their destruction or a taking of the defendant's property without due process of law. See *Crease* v. *Babcock*, 23 Pick. 334, 342; *Granara* v. *Italian Catholic Cemetery Association*, 218 Mass. 387, 391; *Opinion of the Justices*, 300 Mass. 607; *Greenwood* v. *Freight Co.* 105 U. S. 13, 21–22; *Detroit United Railway* v. *Detroit*, 229 U. S. 39, 45–46.

The defendant contends that it is a riparian owner and has a property right of access by means of a pier to navigable waters. It is not necessary to consider this question. The erection of the structures in question was not under any such

claim. On the contrary, they were erected by virtue of and in accordance with the license that was granted under the requirements of R. L. c. 96.

*Decree affirmed with costs.*